**William MINNICK, Petitioner,**

v.

**Ron ANDERSON, Superintendent, Respondent.**

No. 3:99 CV 157 AS.

United States District Court, N.D. Indiana, South Bend Division.

Aug. 22, 2000.

Donald C. Swanson, Swanson and Campbell, Michelle F. Kraus, Fort Wayne, IN, for William A Minnick, petitioner.

Michael R. McLaughlin, Michael A. Hurst, Indiana Attorney General, Indianapolis, IN, for Ron Anderson, Superintendent, Indiana State Prison, respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, William Minnick, was convicted of murder and sentenced to death on the recommendation of the jury in a state court trial conducted in Brazil, Indiana, in the Clay Circuit Court. When that conviction was overturned by the Indiana Supreme Court due to a *Miranda* violation, *Minnick v. State,* 467 N.E.2d 754 (Ind. 1984), he was retried in the Lawrence Circuit Court in Bedford, Indiana, where he was again convicted of murder. After his second trial, the jury unanimously recommended life in prison, but Minnick was sentenced to death by the judge conducting that trial. The within petition was filed by counsel in this Court on September 8, 1999, and oral argument was heard in Lafayette, Indiana on March 16, 2000. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the three decisions in this case by the Supreme Court of Indiana, namely *Minnick v. State,* 467 N.E.2d 754 (Ind. 1984), *cert. denied, Indiana v. Minnick,* 472 U.S. 1032, 105 S.Ct. 3512, 87 L.Ed.2d 642 (1985), *Minnick v. State,* 544 N.E.2d 471 (Ind.1989) and *Minnick v. State,* 698 N.E.2d 745 (Ind.1998), *cert. denied, Min-*

*nick v. Indiana,* 528 U.S. 1006, 120 S.Ct. 501, 145 L.Ed.2d 387 (1999). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The Indiana Supreme Court described the events giving rise to Minnick's conviction as follows:

On the afternoon of October 26, 1981, James D. Payne returned from work to his home in Greencastle, Indiana. He discovered his wife's body on the bedroom floor. He immediately called police. The ensuing investigation revealed Martha Payne had been raped, anally sodomized, stabbed in the right rear shoulder, and struck on the head with a table lamp. In addition, ligature marks on her neck indicated she had been strangled, and burn marks on her ankles showed the perpetrator had attempted to electrocute her as well. The cause of death was determined to be the knife wound in her upper back, which penetrated her lung and severed her pulmonary artery.

*Minnick v. State,* 544 N.E.2d 471, 473 (Ind.1989). That evening, while police cars were still at the Payne home, William Minnick stopped and spoke with Officer Rodney Cline, mentioning that he had been at the Payne home that day looking to do some work. (2 T.R. 2105).[1]

Late that night, a DePauw University student called the Greencastle police and informed them he had seen an orange "Dukes of Hazzard"-type car park in his fraternity's parking lot, approximately one block from the Payne home, and that he had seen a dark haired man dressed in a fatigue jacket and jeans exit the car and walk towards the Payne home. (2 T.R. 1120–23). Officer Cline heard the student's message, and after calling the student back to discuss it further, determined that the individual might have been Minnick. 2 T.R. 1280. At approximately 3:30 a.m., Cline and Officer Larry Shipman went to Minnick's house and asked him to come to the police station for questioning. 2 T.R. 1281. When Minnick asked if the questioning was about his car, Cline responded "you could say it was about your car." 2 T.R. 1282. Cline read Minnick his *Miranda* rights and told him to read the entire form, which included a waiver of his rights, asked Minnick if he understood what he read, then had Minnick sign the form. *Id.* Cline then proceeded to interrogate Minnick about the Payne murder without the benefit of counsel. 2 T.R. 1292. After Cline said "Well, wonder if I told you that we had a knife that had your fingerprints on it?" Minnick slammed Cline against the wall, but his parents pulled him off and calmed him down, stating "if this gets further out of hand, we'll contact [an attorney]." 1 T.R. 730. Minnick attempted to leave the interrogation room, but was restrained. 1 T.R. 560. Prosecutor Del Brewer arrived at the police headquarters between 5:30 and 6:00 a.m. 1 T.R. 562. Using a small tape recorder, Brewer continued the questioning of Minnick, and the recording captured both Minnick's detention and Minnick's request for an attorney[2]. 1 T.R. 2133.

---

1. This court will refer to the record as follows: the transcript from the first trial as 1 T.R. ___, the transcript from the second trial as 2 T.R. ___, the transcript from the remand hearing as R.R. ___ and the transcript from the post-conviction relief hearing as P.C.R. ___.

2. The Indiana Supreme Court transcribed a portion of the tape in their opinion reversing Minnick's first conviction as follows:

MINNICK: I'd rather go home. If you're gonna fingerprint me, fingerprint me. I'd rather go home.

BREWER: You're not leaving. Not yet. Also on, on this, what he's talk-

At approximately 9:30 a.m., Judge Vaughn of the Putnam Circuit Court signed a warrant authorizing the taking of hair, nail scraping, urine, blood and fingerprints from Minnick, and those samples were taken around 11:00 a.m. 2 T.R. 1433, 1460. Minnick was then taken from the Greencastle Police Department to the Putnam County Jail, where he was housed in a single cell on the second floor, at approximately 11:30 a.m. 1 T.R. 572, 583. Between 2:30 and 3:00 p.m., Officer Jim Hendricks of the Putnam County Sheriff's Department brought Minnick to an interview room at the jail. 1 T.R. 583, 2694. Hendricks and Indiana State Police Officer Jim Smith then began to question Minnick without obtaining a waiver. 1 T.R. 584. During the course of the conversation, a recording device was used intermittently, and in the last portion of the recording, Minnick is heard confessing to the murder. 1 T.R. 585–590, 2596–2604, 533.

Based on information gained from the confession, police obtained a warrant to search Minnick's home, where they seized a black shaving kit containing a large quantity of change and an orange wire with a hair attached to it. 2 T.R. 1518. The hair was not mentioned in the warrant or the return, and Sgt. Hanlon of the Indiana State Police (I.S.P.) testified that he either forgot to list the hair or just failed to list it. 2 T.R. 1474. Officer Rairdon of the I.S.P. received the orange wire at the lab, and his receipt does not

mention a hair. Nevertheless a hair was analyzed by the state police and found sufficiently similar to Payne's hair to be of common origin. 2 T.R. 1756. The wire was described on the warrant return as being approximately twelve inches in length and possibly a speaker wire. 2 T.R. 1468. When tested by the state police lab, no blood or skin was found on the wire, and no carbon marks were found on the ends. 2 T.R. 1721.

Dr. John Pless, a forensic pathologist and pathology professor at Indiana University, conducted the autopsy of Payne on October 28, 1981. 2 T.R. 1598. Dr. Pless determined that Payne was killed by a knife wound to her back, but had also received injuries to her neck in an attempted strangulation, a blunt force injury to her head, and marks on her ankles consistent with electrical burns. 2 T.R. 1599–1600. Dr. Pless collected hair and fiber samples, rectal, vaginal and oral swabs, and blood samples from Payne; however, he did not find any evidence of spermatozoa on the swabs. 2 T.R. 1614–15. Dr. Pless was unable to determine a time of death from his examination. 2 T.R. 1612–16.

Minnick was initially represented by Stephen Pierson, who was appointed as pauper counsel by the Putnam Circuit Court on October 28, 1981. 1 T.R. 55. Pierson filed motions for bail, for production of evidence, to suppress evidence, and for change of venue before attorney Woodrow Nasser was employed by Minnick's

ing about on the warrant, you'll be detained because there may have been rape. We're going to take specimens of various parts, as soon as we have the Judge sign it. Which, if the girl was raped and it matches with you, the semen, etcetera (sic), it will also tell us that.

MINNICK: Huh uh. No. -And then can I, am I allowed to go home?

HANLON: Not right now. (inaudible)

MINNICK: Am I under arrest though? Am I under arrest?

BREWER: You're being held for investigation right now.

MINNICK: Am I, am I allowed to go home though?

HANLON: No, no.

MINNICK: Can I get my lawyer then?

CLINE: You're under custodial arrest at this time.

parents and entered his appearance on December 1, 1981. 1 T.R. 86–87, 89, 90, 91–92, 97. Nasser filed Minnick's Notice of Alibi Defense on March 11, 1982, as well as a motion to dismiss. 1 T.R. 171. Most importantly, Nasser briefed and argued the motion to suppress the confession made by Minnick on the afternoon of October 27, 1981. 1 T.R. 502. The case was venued to the Clay Circuit Court, the next county over, and after he denied the motion to suppress, Judge Ernest Yelton presided over Minnick's first trial. 1 T.R. 56, 199, 213. Minnick was convicted on the murder, rape, and robbery charges, although the court granted a directed verdict on the sexual deviate conduct charge, and after the jury recommended a death sentence, the court sentenced Minnick to death. 1 T.R. 328, 333, 362. Minnick appealed his conviction and sentence to the Indiana Supreme Court, and on September 7, 1984, the Indiana Supreme Court reversed his conviction and remanded the case for a new trial, finding that the confession made by Minnick on October 27, 1981 was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The State filed a petition for writ of certiorari, but that petition was denied. *Indiana v. Minnick*, 472 U.S. 1032, 105 S.Ct. 3512, 87 L.Ed.2d 642 (1985).

On remand, Woodrow Nasser was appointed as pauper counsel for Minnick and he moved for a change of venue from the Clay Circuit Court. 2 T.R. 64, 66. The case was transferred to the Lawrence Circuit Court, where Judge Linda Chezem presided, on July 15, 1985. 2 T.R. 66. Nasser moved for production of all evidence not produced during the first trial, and that motion was granted on August 26, 1985. 2 T.R. 159, 173. The second trial then commenced on September 4, 1985 with jury selection on September 4, 5, and 6, 1985. 2 T.R. 181, 184.

As in the first trial, Brewer presented evidence from several of the Greencastle Police, Putnam County Sheriff's Department, and Indiana State Police officers who had participated in the investigation, as well as several friends and relatives of both the victim and Minnick, working to establish Minnick's opportunity. Gary Hood, the Technician Supervisor for the I.S.P., testified that he had gathered evidence at the Payne home and had taken photographs of the crime scene, which were then presented to the jury. 2 T.R. 886 *et seq.* Martha Payne's mother then testified that her daughter would have received $30,000 from a trust fund established by her grandfather when she was 25 and another $30,000 from a trust fund established after her father died when she turned 30. 2 T.R. 961.

Jim Payne, Martha's husband, testified that he arrived home between 4:45 and 4:50 p.m. on October 26, 1981. 2 T.R. 998. He called her name when he arrived home, then went to the bedroom to change his clothes. 2 T.R. 1002. He threw something at the wastebasket, but missed, and when he went to pick it up, he saw the bloody knife on the floor by the basket. 2 T.R. 1002. He then circled the bed and found Martha's body. 2 T.R. 1004. Payne also testified that he had been in the habit of saving his change in a large glass cider jug, and that when he lasted counted the jar in July, 1981, it contained between seventy and eighty dollars. 2 T.R. 976. When he looked after the murder, the jar was gone, although he could not state with certainty that he had seen the jar in the week prior to the murder. 2 T.R. 978. Jim also testified that he and Martha had engaged in sexual intercourse the day prior to the murder and that Martha had used a diaphragm on that occasion. 2 T.R. 994.

Linda (Detro) Marley testified that she had had breakfast with Martha on the morning of October 26, 1981, and that Martha had been prepared to pay for her own breakfast, suggesting that she had cash in her wallet, which was found empty after the murder. 2 T.R. 1060. Additionally, Marley spoke with Martha on the telephone at 12:00 p.m. that day. James Peck, Superintendent of the Greencastle Community Schools, testified that Martha had stopped by his office at approximately 1:15 p.m. to sign up for the substitute teacher list. 2 T.R. 1064. Janet Pierce testified that she was exercising at the Figurette Salon with Martha, and that Martha was still at the salon when she left at 2:10 p.m. Donna Duell, who worked at the Figurette, testified that Martha checked out of the salon at approximately 2:20 p.m. 2 T.R. 1078. Debra Haerr, a neighbor of the Paynes, testified that she saw Martha backing out of the driveway at 12:50 p.m. on October 26, 1981 and that she saw Jim Payne walking towards his porch at 4:55 p.m. that same day. 2 T.R. 1084–85. Haerr also testified that she cleaned the house after the murder and found Martha's diaphragm, which appeared to be clean and in its usual place. 2 T.R. 1086.

Marty Williamson, who knew both Payne and Minnick, testified that Minnick had visited him at 2:30 p.m. on October 26, 1981 and asked him if he would assist Minnick with a job at the Payne house. 2 T.R. 1099. Minnick told Williamson at that time that Payne was not yet home. *Id.* Minnick left, then returned approximately fifteen minutes later and stated that Payne was still not at home. 2 T.R. 1101. Williamson then declined the job offer because he had another job to do that day. *Id.* Williamson then left his house and went to a laundromat to see his future mother-in-law and let her know he wouldn't be able to pick up his girl-friend/future wife after school. 2 T.R. 1104. He noted the time as a few minutes before three. *Id.* As he left the laundromat and started toward his next job in Crawfordsville, he saw Martha Payne walking down the street towards her home. 2 T.R. 1106. Brewer then presented the testimony of Steve Huber, the De-Pauw fraternity member, from the first trial, in which he had testified that he saw a person park an orange Dodge Charger-type vehicle in his fraternity's parking lot at approximately 2: 15 p.m. 2 T.R. 1124. Mace Terry, who had been a student at Greencastle High School and a neighbor of the Payne's, testified that he saw Minnick walking toward the Payne house at approximately 2:55 p.m. 2 T.R. 1138.

Judy Flower, who lived in the upstairs apartment at the Payne house, testified that she returned home from teaching school at approximately 3:15 p.m., turned on her television, and made several phone calls. 2 T.R. 1147. At approximately 3:45 p.m., she heard the downstairs door close and believed it to be Martha checking the mail. 2 T.R. 1149. Flowers made a few more phone calls, then heard Jim Payne arrive home at approximately 4:57 p.m. 2 T.R. 1153. Shortly thereafter, she heard male voices downstairs, looked out her window and saw police cars. 2 T.R. 1158.

Marty Crowe, an acquaintance of Minnick's, testified that Minnick gave him a ride home from his job at Rector Hall at DePauw University at approximately 4:00 p.m. 2 T.R. 1180. Charlene Jones, Minnick's girlfriend at the time, testified that Minnick arrived at her home at approximately 4:30 p.m. and stayed until between 6:00 and 7:00 p.m. 2 T.R. 1193. Howard Keller, former owner of the K&K's Pro service station in Greencastle, testified that Minnick came into his station at approximately 2:00 p.m. and got $2.00 of gas on credit from Keller. 2 T.R. 1199. Harold Smiley, one of Keller's employees,

then testified that Minnick returned to the station and paid for the $2.00 of gas with a dollar bill and four quarters. 2 T.R. 1204. Mark Secrest testified that he saw Minnick at McGoo's, the local video game parlor, between 7:00 and 8:00 p.m. 2 T.R. 1214. Secrest left with Minnick and another individual, Louis Rachel, known as Ace, and went to Secrest's brother's house. 2 T.R. 1215–16. Minnick had purchased a car from Secrest and made his first payment that evening of $50.00, all in change. 2 T.R. 1218. At one point while Minnick, Secrest, and Rachel were counting out the coins, which Minnick had carried in a black shaving kit, some other people arrived at the house, and the three hid the money before opening the door. 2 T.R. 1218. Secrest asked Minnick where he got the money, but Minnick didn't answer. 2 T.R. 1218–19. Secrest also testified that there were pieces of broken clear glass in the bag with the money. 2 T.R. 1223–24.

Rodney Cline, a Greencastle police officer, testified that he was working the rope line at the crime scene and spoke with Minnick at the crime scene the night of October 26, 1981. 2 T.R. 1275. Minnick at that time told Cline he had been at the Payne house that day about a job. *Id.* Cline was the evening shift commander, so when the other officers finally went home for some sleep, Cline stayed on duty and started going through the tapes of phone calls to the department with possible leads. 2 T.R. 1277. Cline heard the tape of the call from DePauw student Steve Huber, and called Huber back at approximately 3:00 a.m. to get a better description from him. 2 T.R. 1280. Based on that information, Cline went to Minnick's home as described above. 2 T.R. 1291. On cross-examination, Cline described a previous confrontation he'd had with Minnick, when Minnick's car had run out of gas and then got a flat tire, and Minnick left the car to get gas. 2 T.R. 1303. When he returned, Cline had called a tow truck, and the two

got into an argument over who would pay for the tow truck. 2 T.R. 1303.

Jo Anne Hayes, who had been the dispatcher at the Clay County Sheriff's Department in 1982 when Minnick was housed there during the first trial, testified that she heard Minnick through the audio monitoring system in his cell state to another individual "and then Martha said .. No, Billy don't .. please don't." 2 T.R. 1325. Dennis Sluder, who had been an inmate at the Clay County Jail along with Minnick, testified that Minnick told him in jail that he had murdered Martha Payne. 2 T.R. 1333. Sluder specifically testified that Minnick told him he had used a hunting knife, that he had stuffed Payne's panties in her mouth to stop her screaming, that he urinated on the electrical wires to create a better connection, and that he stabbed Payne several times before finally killing her by stabbing her in the neck. 2 T.R. 1334.

Officers Norm Varvel and Larry Huffman of the Greencastle Police both testified as to Jim Payne's distraught nature when they arrived at the Payne home. 2 T.R. 1363, 1387. Wayne Hopkins, the Putnam County Coroner and a local funeral home director, testified that when he arrived at the Payne residence shortly after 5:00 p.m., he observed the body and pronounced Martha Payne dead. 2 T.R. 1247. After the technicians had finished taking evidence, Hopkins took the body to his mortuary, and then contacted Dr. John Pless to perform an autopsy. 2 T.R. 1251.

Sheriff Jim Baugh testified primarily about Minnick's escape from the Putnam County Jail on December 6, 1981. 2 T.R. 1392. Minnick was placed in the third "drunk tank" cell upon his return to Putnam County on December 6, 1981. 2 T.R. 1397. After Minnick was discovered to be missing, Baugh went into the cell and saw a Bible with a scratched cover. 2 T.R.

1398. He locked the cell door, then slid the Bible cover into the lock, opening it. *Id.* Sgt. Jack Hanlon of the Indiana State Police testified that he had been present at the scene and assisted in taking evidence. 2 T.R. 1427. He noticed that the carpet under Payne's body was wet and had it taken as evidence. 2 T.R. 1427. Between 4:30 and 5:00 a.m. on October 27, 1981, Hanlon was asked by Prosecutor Brewer to go to the Greencastle Police Department, where the police were interviewing Minnick. 2 T.R. 1432. Hanlon then obtained a search warrant from Judge Vaughn, seeking Minnick's hair, blood, and urine samples. 2 T.R. 1433. Hanlon also testified that he was one of two officers who apprehended Minnick after his escape attempt on December 6, 1981. 2 T.R. 1443.

Charles Rairdon, a crime scene technician for the I.S.P., testified that he took some of the photographs of the Payne home and collected evidence the evening of the crime. 2 T.R. 1507. Additionally, he attended the autopsy and collected evidence from the victim at the autopsy. 2 T.R. 1510. Rairdon was the officer in charge of maintaining the evidence log, and he produced all of the physical evidence taken at the scene. 2 T.R. 1515–19. Dr. Pless testified that he had performed an autopsy on Martha Payne on October 28, 1981. 2 T.R. 1599. In that autopsy, he found a single stab wound in the back to the right of the spine, which pierced a lung and a major pulmonary artery. 2 T.R. 1600. Additionally, he found ligature marks around her neck and hemorrhages of the face which suggested a strangulation attempt, a blunt force injury on the back of the head, and small areas of burning of the tissue on the inside of both ankles. *Id.* He found the burning to be consistent with an electrical burning. 2 T.R. 1607. Pless further testified that he did not find any sperm on the swabs he took from the victim. 2 T.R. 1630. He did, however, find hyperemia of the vagina, suggestive of irritation, which would not have been caused by Payne's intercourse with her husband the previous day. 2 T.R. 1635.

William Kuhn, a forensic serologist at the I.S.P. Laboratory, testified that he tested the carpet sample from the Payne home and found semen from an individual with type O blood who secreted his blood type in his bodily fluids, i.e., a type O secretor. 2 T.R. 1688. Kuhn also typed samples from Jim Payne, Minnick, and Louis 'Ace' Rachel, and found that Payne was a type O secretor, as was Minnick, but that Rachel was a type A secretor. 2 T.R. 1699, 1701. Thus, the semen stain on the carpet could have come from either Jim Payne or from Minnick. 2 T.R. 1701. Kuhn did find sperm on the vaginal swabs. 2 T.R. 1724. Michael Oliver, a hair and fiber examiner with the I.S.P. Laboratory, testified that he compared a hair found on an orange wire in Minnick's car and found the hair to be sufficiently similar to be of common origin to the victim, Martha Payne. 2 T.R. 1756. The prosecution then finished with the testimony of Linda Copeland from the first trial, at which she testified that she had been incarcerated at the Putnam County Jail at the same time as Minnick, and that Minnick had told her that he had raped the victim, but that Ace had killed her. 2 T.R. 1801.

The defense presented Wanda Rogers, Minnick's mother, to testify that Minnick was a good worker and that the entire family had a practice of keeping coins in jars. 2 T.R. 1907, 1909. Rogers also testified that on December 6, 1981, when Minnick escaped from jail, he arrived at her doorstep with fresh cuts on his face. 2 T.R. 1912. Minnick's brother, Earl Minnick, testified about Minnick's change bag and about Minnick's bruised appearance during his escape attempt. 2 T.R. 1927,

1930. The testimony of Annette Boyd, operator of the Commercial Hotel, was read from the first trial. 2 T.R. 1950. At that trial, she testified that she had accused Ace Rachel of killing Martha Payne, and that Phil Burchett then told her Rachel asked him to kill her. 2 T.R. 1955, 1957.

Jerry Nodley then testified that he had been working at the United Oil Station in Greencastle on the day of the murder and that he saw Minnick at the station between 3:00 and 3:15 p.m. that afternoon when Minnick purchased fifteen dollars of gas. 2 T.R. 1963. Earl Richardson, a mechanic at K&K Pro Station, testified that he saw Minnick in the garage between 3:00 and 3:30 p.m. on October 26, 1981. 2 T.R. 1996. Dennis Rumley, who also worked at the K&K Pro Station, also testified that he saw Minnick at the station between 3:30 and 3:45 p.m. 2 T.R. 2008. The testimony of Amy Kern from the first trial was read into the record. 2 T.R. 2020. Kern, an eleven year-old paper carrier at the time of the murder, testified that she heard a scream coming from the Payne home approximately twenty to thirty minutes before the police cars arrived at the home. 2 T.R. 2025. Linda Copeland's prior testimony as a defense witness was read, in which she stated that the Sheriff had maced Minnick prior to lunch time on Tuesday, October 27, 1981. 2 T.R. 2037. Minnick was yelling for his lawyer at the time and may have spit in the Sheriff's face. *Id.*

Minnick personally took the stand during the second trial. 2 T.R. 2082. Initially, he was presented for the limited purpose of showing Officer Cline's animus towards him, but when that was excluded, Minnick stayed on the stand, explained his activities on October 26, 1981, testified that he had escaped from his unlocked cell on December 6, 1981 because he had been beaten by an officer, and proclaimed his innocence. 2 T.R. 2089, 2107–2128, 2141–2146, 2158. The prosecutor attempted to cross-examine Minnick about his prior confession, but the court held a brief suppression hearing and determined that the statement should not be used for purposes of impeachment because Minnick had not been warned of that possibility prior to taking the stand. 2 T.R. 2196. The defense rested at the end of Minnick's testimony. 2 T.R. 2205.

The jury received the case for deliberations on September 18, 1985, and that same day reached verdicts of guilty on all counts. 2 T.R. 218. The following day, the jury returned for the penalty phase of the trial. 2 T.R. 271. The state presented no additional evidence, resting on the evidence it had presented during the trial. 2 T.R. 2303. The defense presented Minnick, who again denied any involvement in the offense. 2 T.R. 2307. The jury deliberated and recommended that the death penalty not be imposed. 2 T.R. 2339.

On October 16, 1985, the court held the sentencing hearing for Minnick. 2 T.R. 305. The probation officer testified as to her pre-sentence report. 2 T.R. 343. The prosecutor tried again to put the suppressed confession into the record, which the court denied. 2 T.R. 350. The defense put Minnick on the stand, and he again protested his innocence. 2 T.R. 361. No other evidence was presented, and the court orally and in writing rendered her findings. 2 T.R. 306–07, 370–72. She specifically stated as follows:

> Pursuant to Indiana Code 35–50–2–9 the court finds that beyond a reasonable doubt, based on evidence presented at trial, that William A. Minnick murdered Martha Payne while committing rape and robbery. The court specifically finds as aggravating circumstances that the decedent was in her own home where she had every right to be secure

from William Minnick. The court further finds as an aggravating circumstance that the crime mutilated her body and defiled her even after death, that the crime was the kind of horrendous crime that the legislature anticipated when it listed rape or robbery as aggravating circumstances and, therefore, the court specifically find that the circumstances of the crime, the violence of the attempted electrocution, the strangling and the knifing are those kinds of aggravating circumstances. The court further finds as an aggravating circumstance the rape and after death violation of Martha Payne's body.

The court, after considering all mitigating circumstances listed by statute and pursuant to the last paragraph thereof had looked for any other circumstances appropriate for consideration. The court feels that a clean record for three months of adulthood is not the kind of lack of criminal record that the legislature envisioned in setting out the statutes for mitigating circumstances and the courts finds same not to be a mitigating circumstance.

The court further finds the aggravating circumstances overwhelmingly outweigh the mitigating circumstances.

The court now ORDERS that William A. Minnick, for the crime of murder while committing rape and robbery, be executed.

2 T.R. 306–07. Minnick appealed the conviction and sentence directly to the Indiana Supreme Court.

Unbeknownst to the Lawrence Circuit Court, Minnick, or his counsel, Prosecutor Del Brewer had, on August 22, 1985, sent a portion of the carpet sample to the Serological Research Institute (SERI) in California for further testing on the semen found on the sample. P.C.R. 135. On September 3, 1985, the day before jury selection commenced in the second trial, Brewer had a telephone conversation with Lori Rawlinson, a serologist with SERI, in which she informed him that there were two types of semen on the carpet, type O secretor and non-secretor. R.R. 301. At that time, the testing done by the I.S.P. Laboratory showed both Minnick and Jim Payne to be type O secretors. 2 T.R. 1701. Brewer did not disclose this information either to the court or to defense counsel. After the trial, Brewer had blood and saliva samples taken from Payne and Minnick sent to SERI, again without Minnick's knowledge or consent, and those samples showed that Minnick was, in fact, a non-secretor. R.R. 32. Minnick's counsel, Woodrow Nasser, learned of the results of the additional testing through an unnamed source in February 1987, sixteen months after the sentence was rendered in the trial court. R.R. 24. Nasser sent a letter to the newly-elected Putnam County Prosecutor, Robert Lowe, and Lowe sent Nasser a copy of a letter he had received from Brewer, explaining the carpet testing. R.R. 24. The issue was raised before the Indiana Supreme Court, which had not yet ruled on Minnick's direct appeal, and the Supreme Court made a limited remand of the case, only to consider two issues, a misstatement of fact by witness Michael Oliver and the evidence concerning the new testing. R.R. 58–59.

At the remand hearing, the court determined that the misstatement of fact by witness Oliver, that some of Minnick's public hair had been found in a sample taken from the victim, was harmless error because it was corrected in front of the jury on cross-examination. R.R. 106. With respect to the newly discovered evidence, the court found that Minnick was not excluded as a donor of the semen on the carpet because he was now found to be a non-secretor. R.R. 107. Thus, the court found the evidence to be non-exculpatory and would not have altered the outcome of the

trial. R.R. 108. Having made those findings, the cause was sent back to the Indiana Supreme Court.

The Indiana Supreme Court rendered its opinion on Minnick's direct appeal on October 2, 1989. *Minnick v. State*, 544 N.E.2d 471 (Ind.1989). Justice Givan wrote the majority opinion, with Chief Justice Shepard and Justice Pivarnik concurring, affirming both the conviction and the sentence. 544 N.E.2d at 473. Minnick first appealed the trial court's conclusion that the misstatement of evidence had no effect on the outcome of the trial. *Id.* at 474. The Supreme Court found that because the misstatement was not emphasized and was in a contradictory context, "it likely failed to influence the jury" and thus the trial court's decision on remand was not an abuse of discretion. *Id.* at 475. Minnick then appealed the trial court's denial of his motion for new trial based on the newly discovered evidence. *Id.* The court held that because the newly discovered evidence was not likely to change the outcome on retrial, because Minnick was not excluded as a possible semen donor, the trial court had not abused her discretion.

Minnick argued that the charging information failed to specify whether he was charged with felony murder or intentional murder, and in a related claim, that he could be sentenced to death for committing felony murder. 544 N.E.2d at 475–76. However, the court found that a defense against felony murder would also be a defense against intentional murder, so the charging information was sufficient, and that IND. CODE 35–50–2–9, the death penalty statute, requires that the murder be intentional before a separate felony such as rape or robbery can be considered an aggravating circumstance, thus granting equal protection to felony murderers. *Id.* at 476. Minnick asserted that his motion to dismiss should have been granted for lack of probable cause for his arrest. *Id.* However, the court found that

> [Minnick]'s admission to Sergeant Cline that the former had been in the victim's home the afternoon of the murder, made while Cline was securing the perimeter of the Payne home, verified that appellant and his car had in fact been in close proximity to the murder that afternoon and, combined with Cline's knowledge of appellant's propensity toward burglary, provided sufficient probable cause of appellant's arrest.

544 N.E.2d at 476.[3] The Supreme Court found adequate evidence to support the finding of probable cause. *Id.* Minnick also appealed the denial of his motion to dismiss when he did not have an initial hearing within twenty-four hours of his arrest. *Id.* at 477. The court found that because his confession made during those hours was suppressed, no prejudice sprang from the delay, and thus no error resulted. *Id.*

Minnick argued that the court should have suppressed his statements made to Sergeant Cline when he was first questioned because he did not intelligently

**3.** Minnick, in both his P.C.R. petition (P.C.R. 848–49, fn.1) and his habeas petition (p. 4, fn.2), complains that he can find no evidence from Cline to support this statement. Certainly Cline testified that Minnick spoke to him at the Payne home on the evening of the murder and admitted his presence in the home. 2 T.R. 1275. This court cannot find testimony by Cline regarding knowledge of Minnick's propensity toward burglary, although Cline had been an officer in Greencastle when Minnick was sent to the Indiana Boys School for burglary, so he may have had that knowledge. In any event, Cline did not arrest Minnick, Jack Hanlon did, and Hanlon was the one to appear before Judge Vaughn at the probable cause hearing. 1 T.R. 458. While the Supreme Court of Indiana's opinion is not completely correct, this court does not find the error to be significant.

waive his rights. *Id.* The court found both that Minnick was "well aware" of his rights and that the statements that he made to Cline the morning of the 27th only confirmed what Minnick had told Cline the evening of the 26th outside the Payne home. *Id.* Similarly the court found no error in the trial court's admission of the waiver form signed by Minnick prior to his conversation with Cline, holding that there was no prejudice in allowing its admission. *Id.* Minnick appealed the trial court's admission of the black shaving bag and orange wire retrieved from his vehicle pursuant to a search warrant, claiming that discrepancies in their descriptions between the warrant return and the trial rendered their admission erroneous. *Id.* at 478. The court held that such discrepancies went to the weight and not their admissibility. *Id.*

Minnick next complained that the trial court committed fundamental error when it allowed the jurors' families to visit them while sequestered. *Id.* The court held that because Minnick had not made a contemporaneous objection, the issue was waived. *Id.* Similarly, the court denied Minnick's challenge to the admission of Payne's wedding picture and other "sympathetic" pictures because they were primarily used as identification for witnesses who had observed Payne's whereabouts on the day of her death. *Id.* The court also denied Minnick's contention that the trial court erred in refusing to allow Minnick's girlfriend, Charlene Jones, testify regarding Officer Cline's "ill will" towards Minnick. *Id.* The court found such evidence to be irrelevant and inadmissible. *Id.* at 479.

Minnick argued that the State's exhibits were improperly admitted due to defects in the chain of custody arising from their time in the custody of the Clay Circuit Court. *Id.* The Indiana Supreme Court held that the chain of custody was sufficiently established to allow the admission of the evidence. *Id.* Minnick appealed the trial court's refusal to declare a mistrial when Officer Varvel referred to turning a bottle over "to a Court" and similarly, the continued references to the transcript from the prior trial when impeaching various witnesses. *Id.* The court found that the references were too vague to subject Minnick to a "position of grave peril" and thus found no error. *Id.*

The court denied Minnick's claim that the trial court's overruling of his oral motion in limine to exclude evidence of anal penetration was error. *Id.* at 480. Although Minnick was acquitted of the charge of Sexual Deviate Conduct by a directed verdict in the first trial, the Indiana Supreme Court held that the reference to anal penetration did not create double jeopardy because he was not charged with criminal deviate conduct before the second jury and because that evidence from the pathologist constituted part of the *res gestae* of the crime. *Id.* The court also denied Minnick's objection to the testimony of Jo Anne Hayes, the Clay County Jail dispatcher, holding that her testimony was the best evidence of what she saw and heard and that because it was a statement against interest, it was admissible under the hearsay rule. *Id.* at 481. Minnick's final argument about the evidence is that it was insufficient to uphold his convictions on all three charges, but having found all of the evidence admissible, the Indiana Supreme Court found that the evidence did support the convictions. *Id.*

Minnick then alleged error in the trial court's failure "to properly weigh the aggravating and mitigating circumstances, and further failed to ... take into consideration the pre-sentence report." *Id.* Additionally, Minnick argued that the trial court failed to consider the jury's recommendation because after the jury made its

recommendation, the prosecutor played the taped confession for the jury so they would know what they had not been allowed to hear if others questioned them about their verdict and recommendation. *Id.* Even though the Indiana Supreme Court found that some jurors then made comments to the trial judge to the effect that they would have recommended the death sentence had they known of the confession, it held that the trial judge's decision on sentencing was based solely on the record before her, not including the confession. *Id.* The Supreme Court then applied its recent holding in *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989) to Minnick's facts, even though neither party had the opportunity to brief *Martinez Chavez*'s applicability, and held that in light of the manner in which Martha Payne was killed, "no reasonable person would find a death sentence inappropriate here." *Id.* at 482. Thus the court held that the trial court had not failed to consider the jury's recommendation in making her sentence upon Minnick. *Id.*

Minnick argued finally that the trial court considered inappropriate aggravating factors and that it failed to 'verify' that it had considered the pre-sentence report. *Id.* The court held that the consideration of other statutory aggravating circumstances is appropriate as long as one of the aggravating circumstances is listed in IND. CODE § 35–50–2–9(b). *Id.* Additionally, at the sentencing hearing, the probation officer who prepared the pre-sentence report testified and was cross-examined by Minnick's counsel. *Id.* Thus, the trial court was well aware of the report. *Id.* Thus, the Indiana Supreme Court affirmed both Minnick's conviction and his sentence.

Justice DeBruler, joined by Justice Dickson, concurred in the murder conviction, but would have reversed both the rape and robbery convictions and set aside the death sentence. 544 N.E.2d at 484.

Justice DeBruler wrote that the use of non-death penalty statute aggravators by a trial court when determining a death sentence was inappropriate because it gives weight to items not considered by the legislature in determining the death penalty. *Id.* at 483.

After his petition for rehearing was denied by the Indiana Supreme Court on December 13, 1989, 544 N.E.2d at 471, Minnick began pursuing post-conviction relief in the Indiana state courts. Attorneys Kevin McGoff and Lorinda Meier Youngcourt were appointed by the Public Defender of Indiana to represent Minnick in his post-conviction proceedings, and McGoff filed his appearance and requested a stay of execution on August 7, 1990. P.C.R. 3. After several extensions, the petition for post-conviction relief was filed on June 3, 1992. P.C.R. 93. The petition listed the following grounds for relief: that the state withheld exculpatory evidence, that Minnick was denied effective assistance of counsel in the penalty phase, and that Minnick's counsel was rendered ineffective because he was denied funds with which to secure expert assistance. P.C.R. 94. The court began the evidentiary hearing on the petition on December 6, 1993, and that hearing continued over December 7, 1993, March 11, 1994, August 29—31, 1994, and November 21, 1994. P.C.R. 7–10. On March 1, 1995, Minnick, by counsel filed his final amendment to his petition for post-conviction relief and brief in support thereof. P.C.R. 844. The state responded thereto on March 27, 1995, Minnick filed a reply brief on April 17, 1995, and the court denied the petition on June 13, 1995. P.C.R. 11.

The trial court adopted the state's proposed findings of fact and conclusions of law verbatim, holding that the evidence of the non-secretor semen was not exculpatory because Minnick was a non-secretor,

and that the failure to disclose the evidence was not a *Brady* violation because the evidence was not exculpatory and no prejudice arose from the failure to disclose it. P.C.R. 1355–61. The court found that evidence supported the jury's verdicts of intentional murder, rape, and robbery. P.C.R. 1362, 1366, 1369. The court went through a number of issues of purported ineffective assistance of counsel at trial and on appeal and found that Woodrow Nasser had provided effective assistance of counsel at trial and on appeal. P.C.R. 1383. Finally, the court found that the failure to present additional mitigation evidence, such as had been presented during post-conviction proceedings, was not ineffective assistance of counsel. P.C.R. 1397. Thus, the court denied the petition for post-conviction relief. P.C.R. 1398.

Minnick then appealed the denial of his petition for post-conviction relief to the Indiana Supreme Court. *Minnick v. State*, 698 N.E.2d 745 (Ind.1998). Justice Dickson wrote for the majority, affirming the denial of post-conviction relief. 698 N.E.2d at 750. The court first addressed Minnick's primary concern, the issue of prosecutorial misconduct and held that because Minnick had failed to raise a *Brady* claim on direct appeal, that claim was forfeited, except to the extent it comprised an ineffective assistance of appellate counsel claim. *Id.* at 751. Turning to the issue of ineffective assistance of counsel, the court addressed the four prongs of Minnick's claim: that he was denied effective assistance due to the trial court's failure to provide witness or investigation fees and to timely pay his appointed counsel, to the failure of defense counsel to adequately prepare for the guilt phase, to the failure of defense counsel to adequately present mitigation in the sentencing hearing, and to the failure of appellate counsel to present the prosecutorial misconduct issue. *Id.* On his claim of ineffective assistance due to lack of funding for his counsel,

Minnick relied on *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), in which the Supreme Court held that a denial of effective representation can be presumed when certain conditions exist. *Id.* The Indiana Supreme Court explained that *Cronic* set forth three circumstances justifying a presumption of ineffectiveness:

(1) the complete denial of counsel; (2) situations when counsel entirely fails to subject the State's case to meaningful adversarial testing; and (3) situations where surrounding circumstances are such that, 'although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

698 N.E.2d at 752, quoting *Cronic*, 466 U.S. at 659–60, 104 S.Ct. 2039. Minnick asserted that the absence of fund for defense counsel created a "surrounding circumstance" such that a fully competent attorney would have been unable to provide effective assistance. *Id.* The Indiana Supreme Court ruled that because Minnick's counsel had not made a request for funds, the circumstance could not be proved, and in any event, his counsel continued to represent him despite the court's failure to pay counsel in a timely manner. *Id.* Thus, the court found the *Cronic* exception did not apply. *Id.*

The court then considered the remainder of Minnick's ineffective assistance of counsel claims under the familiar *Strickland* two-part test of deficient performance and actual prejudice. *Id.* On the issue of inadequate preparation for trial, the Indiana Supreme Court determined that Minnick's counsel would have "been remiss in seeking a delay for additional testing which would likely be detrimental to the

defendant." *Id.* at 753. Additionally, the court found, as did the PCR court, that the cross-examination of the pathologist by the trial counsel was not ineffective. *Id.* On the issue of inadequate preparation for sentencing, the PCR court determined that although Minnick's counsel was "below standard" in presenting mitigation evidence at sentencing, the little mitigation evidence presented at PCR was still "far outweighed by the aggravating factors." *Id.* citing P.C.R. 1396.

Finally, Minnick asserted that his counsel was inadequate on appeal for failing to include the pre-sentence report in the record of proceedings and for failing to raise the *Brady* issue and prosecutorial misconduct on the direct appeal of his second trial. *Id.* at 754. On the pre-sentence report issue, the court held that no prejudice stemmed from Minnick's counsel's failure to include the pre-sentence report, as the report is consistent with the PCR court's determination of mitigating circumstances. *Id.* On the *Brady* issue, the court considered the issue under the holding of *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) and *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). *Id.* at 755–56. Under *Bagley,* the court explained, "evidence is 'material' only if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Minnick,* 698 N.E.2d at 755, quoting *Bagley,* 473 U.S. at 685, 105 S.Ct. 3375. To make the non-secretor evidence material, Minnick sought to exclude the facts discovered after the trial, citing *United States v. Dimas,* 3 F.3d 1015 (7th Cir. 1993) and *United States v. Veras,* 51 F.3d 1365 (7th Cir.1995). 698 N.E.2d at 755. But the Indiana Supreme Court determined that to allow Minnick to exclude the evidence that he was, in fact, a non-secretor, would provide him a windfall to which he was not entitled. *Id.* at 757.

Additionally, in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court had further defined claims under *Brady* and *Bagley,* stating that such claims should "be governed by whether, considering the absence of the suppressed evidence, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id.,* citing *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. The Indiana Supreme Court found that Minnick's appellate counsel had not been ineffective for failing to raise this issue on direct appeal because it was neither deficient performance nor actual prejudice. *Id.* Although the Indiana Supreme Court reprimanded the prosecutor for his actions, because of the "strange evidentiary metamorphosis," no *Brady* violation existed. *Id.* Similarly, Minnick's claim of ineffective assistance of appellate counsel failed, because no prejudice resulted from the misconduct. *Id.* at 758.

Minnick next claimed error in the trial court's consideration of non-death penalty statutory aggravating factors in deciding his sentence. *Id.* On direct appeal, Minnick argued that the judge had considered aggravating factors outside those listed in the death penalty statute in rendering her sentence. *Id.* The Indiana Supreme Court, on direct appeal, upheld that decision because at least one of the death penalty aggravating circumstances had been found. *Id.* In *Bivins v. State,* 642 N.E.2d 928 (Ind.1994), the Indiana Supreme Court decided that courts could only impose the death penalty based on aggravating factors listed in the death penalty statute; however, the rule was specifically *not* made retroactive. *Id.* Minnick claimed at PCR and on appeal that the use of non-statutory aggravators was unconstitutionally vague under *Bellmore v. State,* 602 N.E.2d 111 (Ind.1992). *Id.* However, the Indiana Supreme Court held that *Bivins* was not retroactive and *Bellmore* had

not been argued on direct appeal and was thus forfeited. *Id.* at 759. Minnick also argued that by including non-statutory aggravating consideration, the trial court based its decision on issues not before the jury in violation of *Thompson v. State,* 492 N.E.2d 264 (Ind.1986). 698 N.E.2d at 759. Because he failed to raise this issue on direct appeal, Minnick suggested that the error ·was fundamental, citing *Lowery v. State,* 640 N.E.2d 1031 (Ind.1994). *Id.* The court first stated that *Lowery* had not created binding authority on fundamental error on this issue and further stated that the error here was not fundamental and was forfeited due to the failure to raise it on direct appeal. *Id.*

Minnick next asserted a claim that the trial court erred in failing to consider the jury's recommendation in ordering a death sentence. *Id.* The PCR court determined that the issue was res judicata, but Minnick argued on appeal that because the Indiana Supreme Court had dealt with the issue sua sponte, res judicata should not apply because he had not had the opportunity to brief the issue, and he argued that the court's decision was incorrect correct and resulted in manifest injustice. *Id.* The court determined that the issue was res judicata, and further determined that it had considered the jury's recommendation in reviewing Minnick's death sentence on direct appeal. *Id.* at 760. Thus, the Indiana Supreme Court affirmed the PCR court's determination on this issue.

Finally, Minnick made assertions regarding the facial invalidity of the Indiana death penalty statute, which the court rejected. *Id.* Thus, the court affirmed the lower court's denial of Minnick's petition for post-conviction relief. Justice Sullivan dissented on two grounds, that the trial court inappropriately used non-statutory aggravating factors and that the trial court improperly overrode the jury's recommendation against death. *Id.* at 761. Minnick

filed a petition for writ of certiorari to the United States Supreme Court, which was denied. *Minnick v. Indiana,* 528 U.S. 1006, 120 S.Ct. 501, 145 L.Ed.2d 387 (1999) He then filed his petition for writ of habeas corpus in this court on September 8, 1999.

## II. Standard of Review

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

> A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Terry Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[4] *Terry Williams* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context.[5] 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

---

4. The United States Supreme Court also issued an opinion in *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) on April 18, 2000. While that opinion also addresses the AEDPA, it primarily concerns the need for an evidentiary hearing in the federal district court. As such has not been requested here, this order will not discuss that case. It will, however, differentiate the two *Williams* cases by using the first names of the petitioners therein.

5. Because both *Terry Williams* and *Michael Wayne Williams* were handed down after oral argument in this case, this court ordered both sides to file supplemental briefs regarding the impact of these cases on Minnick's claims.

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

■ It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke,* 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.,* citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). *See also, Lewis v. Miller,* 220 F.3d 485 (7th Cir.2000). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Due Process Claims

Minnick's first two contentions, which this court will address together, are that the due process clause was violated by the presentation of false testimony by the prosecution, specifically the testimony that only type O secretor semen was found on the carpet, and that the due process clause was violated by the non-disclosure of the results of the additional testing on the carpet, which Minnick discusses in terms of prosecutorial misconduct and as a *Bra-*

*dy* violation. Lieutenant Rairdon, the evidence technician, testified that a piece of carpet had been sent to the lab in California, but that he had not received the report yet. Captain Kuhn, the serologist, testified that his tests indicated only one semen donator, and that that individual was a type O secretor. Evidence from the remand hearing indicated that the prosecutor was aware at the time of trial that a second semen donor had been found on the carpet sample, and that the second donator was a non-secretor. Because it was not known at the time of the second trial that Minnick was, in fact, a non-secretor, Minnick now argues that had the evidence of the non-secretor been disclosed to him in a timely manner prior to the second trial, the outcome would have been different, and thus the failure to disclose it violated *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state responds first that these claim are procedurally defaulted because they were addressed on adequate and independent state grounds and further argues that the claims are meritless in any event because Minnick suffered no prejudice from the failure to disclose the new information.

■ Under *Napue,* "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." 360 U.S. at 269, 79 S.Ct. 1173. Further explaining that holding in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that a "new trial is required if 'the false testimony could … in any reasonable likelihood have affected the judgment of the jury …' " *Giglio,* 405 U.S. at 154, 92 S.Ct. 763 *citing Napue,* supra, at 271, 79 S.Ct. 1173. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) [6] requires Minnick to show that the prosecution suppressed evidence which was favorable to the defense and was material. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) explained that "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682, 105 S.Ct. 3375. Finally, the Supreme Court explained in *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) that Minnick must prove both misconduct and prejudice stemming from that misconduct to prevail on a claim of prosecutorial misconduct.

■ It seems clear that the Supreme Court has determined in all of these areas that the evidence not disclosed, or the false evidence presented, or the misconduct, must be "material" before it will entitle a petitioner to a new trial. In this case, the evidence of the non-secretor semen was eventually shown to be non-exculpatory, since Minnick is a non-secretor. Minnick argues that the evidence should only be considered in the timeframe of the trial, before Minnick's non-secretor status was known. This court concurs with the Indiana Supreme Court's analysis of *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) in this respect, however. The Indiana Supreme Court explained:

> In *Fretwell,* the defendant's counsel failed to make an objection that would have been sustained under the law as it

6. For a recent discussion of *Brady v. Maryland* in the Seventh Circuit, see Judge Rovner's dissent in *Mendiola v. Schomig,* 224 F.3d 589 (7th Cir.2000).

existed at the time of trial. The law later changed and, at the time of the defendant's appeal, the objection would have been properly overruled. Similar to the defendant's argument in the present case, the defendant in *Fretwell* argued that the Court should look only to what happened at trial, contending that the "use of hindsight is inappropriate in determining 'prejudice' under *Strickland*, and that this element should be determined under the laws existing at the time of trial." *Fretwell*, 506 U.S. at 371, 113 S.Ct. at 844, 122 L.Ed.2d at 190. However, the Court rejected this argument, stating that the question was whether "the result of the trial [was] unreliable or the proceeding fundamentally unfair." *Id.* at 372, 113 S.Ct. at 844, 122 L.Ed.2d at 191. The Court held that reversing the defendant's conviction would "grant the defendant a windfall to which the law does not entitle him." *Id.* at 370, 113 S.Ct. at 843, 122 L.Ed.2d at 189.

*Minnick v. State*, 698 N.E.2d at 757. Similarly, if this court viewed the non-secretor evidence within the narrow window Minnick suggests, Minnick would be granted "a windfall to which the law does not entitle him." Such is not an appropriate outcome here.

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has been in effect for thirty-seven years. It is based on the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States and is clearly applicable to the states. This court has been examining state court criminal records on an almost a daily basis for the last twenty five years and has become increasingly concerned that some, certainly not nearly all, Indiana prosecutors are failing to give the basic values in *Brady v. Maryland* their proper play. It does not serve the prosecutorial function, in either the short run or the long run, to ignore the basic command of *Brady* and such should be avoided at all cost. Although it is not outcome-determinative in this case, the actions of the prosecutor in this case ran very close to violating the spirit of *Brady*, and such was not appropriate. While this court cannot approve of the actions of the prosecutor here, because of the "strange evidentiary metamorphosis" in this case, this court concurs with the Indiana Supreme Court that no violation of *Brady* or *Napue* occurred here because the non-secretor semen evidence was eventually found to be not material. Thus, this court must deny the petition for habeas relief on this ground.

## IV. Ineffective Assistance of Counsel

■ Minnick next argues that he was denied effective assistance of counsel during the pre-trial proceedings, the guilt phase of the trial, the penalty phase of the trial, the sentencing hearing before the trial court and on appeal, in part because his counsel was denied access to funds with which to secure expert assistance. This claim is considered under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Minnick must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for coun-

sel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

There is no question after *Terry Williams* that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Terry Williams,* 120 S.Ct. at 1512. Additionally, it is clear that the Indiana Supreme Court has not decided this issue in a manner "contrary to ... clearly established Federal law." Thus the sole question for this court is whether the Indiana Supreme Court's decision affirming the denial of Miller's petition for post-conviction relief "involved an unreasonable application of" *Strickland.*

Minnick's counsel for both trials and both direct appeals, Woodrow Nasser, was paid by Minnick's family for the first trial, but after Minnick's first conviction, Nasser was appointed as pauper counsel because Minnick and his family did not have the funds to continue paying him. Nasser was not paid in a timely manner by the State of Indiana for his representation of Minnick, and the court denied a motion by Nasser for a preliminary disbursement of funds to be used for experts. Nasser eventually filed bankruptcy in November 1987, in part due to his representation of Minnick.

Minnick argues that Nasser was ineffective during the pre-trial and guilt phases for failing to obtain the funds necessary to hire an expert and for failing to request a continuance when Officer Rairdon testified that the carpet sample had been sent to the lab in California. He claims Nasser was ineffective during the penalty phase and sentencing for failing to investigate, develop, and present mitigating evidence.

Specifically, Minnick claims that Nasser was ineffective for failing to present the mitigating evidence of physical and possibly sexual abuse [7] of Minnick in his childhood, as well as his depressed economic situation, his low average intelligence, and his possible psychological problems.

The Indiana Supreme Court, in reviewing Minnick's claims of ineffective assistance of counsel under the *Strickland* standard, held that Nasser was not ineffective during the pre-trial and guilt phases, finding that counsel on PCR had not done a significantly better job of cross-examining various witnesses and that requesting a continuance in the trial to allow for defense testing of the carpet sample would have been more detrimental to Minnick than helpful. 698 N.E.2d at 753. The court held that because the jury recommended against the death penalty, Minnick's counsel was obviously not ineffective during the penalty phase. *Id.* Thus, the only issue was Nasser's failure to bring out several issues during the sentencing hearing. *Id.* The court found there that although Nasser's effort was below standard, what little evidence of mitigation was presented by PCR counsel was far outweighed by the aggravating factors. *Id.* Thus, the Indiana Supreme Court affirmed the trial court's decision denying post-conviction relief.

This court cannot say that the Indiana Supreme Court's determination on the issue of ineffective assistance of counsel was an unreasonable application of *Strickland.* Additionally, this court finds Woodrow Nasser was effective in his representation of William Minnick. Thus, habeas relief under 28 U.S.C. § 2254 is inappropriate on this claim.

---

**7.** Minnick claims that evidence exists to support the claim that he was sexually abused as a child by his stepfather. However, Minnick has never personally testified to this, nor has anyone else in the Minnick family. The PCR court found that this suggestion was not supported by evidence and did not consider it as a mitigating factor.

## V. Jury Override Issue

■ In this case, unlike most but not all others that have been here considered, the essential question is whether or not the Constitution of the United States is violated in a state court criminal proceeding when a jury has determined guilt, but then recommends unanimously against the imposition of the death penalty, and the presiding state court trial judge, nonetheless, imposes such penalty. Obviously, there are serious questions of federalism, but there are equally important questions of fundamental rights under the Constitution of the United States. The two principle provisions of that constitution are the 8th Amendment, proscribing cruel and unusual punishments, and the right to trial by jury in the 6th Amendment and in Article III of the original constitution itself. In that setting one has to approach this delicate, but fundamental problem very carefully.

Certainly, it does not violate the Constitution of the United States for states such as Indiana to provide that the ultimate sentencing authority at the trial court level in criminal cases where the death penalty may be imposed is with the state trial judge. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). There are also numerous cases, some of which have been before this court, in which the state trial judge has imposed the death penalty where the jury hearing the case did not recommend it, and in cases that the jury hearing the case was divided. In this case, however, the jury was not divided and unanimously recommended against the imposition of the death penalty. A very experienced and talented state trial court judge (later with a distinguished career on the Court of Appeals of Indiana) chose to impose the death penalty in the face of a contrary jury recommendation. It is this precise and narrow factual setting which causes this court continued constitutional concerns. It is not the concern here that the sentencing trial judge violated the Constitution of Indiana, because she didn't. And it is not the concern here that she may have also violated statutes of the State of Indiana, because she didn't. The concern here has to do with a profound respect embedded in the language, the intent, and the history, of the Constitution of the United States itself, with respect to the right to trial by jury and the profound respect which must be afforded that decisional process. This is certainly not a Seventh Amendment case, but the Seventh Amendment is emblematic in its language of the respect that must be had for the decisional fact finding processes of the jury. Obviously, this court can not, and does not now, attempt to bottom its decision here on Seventh Amendment grounds. This court is profoundly concerned for what it conceives to be fundamental constitutional values under a basic provision of the Constitution of the United States in Article III and in Amendment VI. There is no doubt that this petitioner committed a heinous crime, and that he has already been the rich beneficiary of abundant due process in the state judiciary. Neither is it objectionable that this able and distinguished state trial judge was morally incensed and outraged by this petitioner's criminal conduct. There is enough in the record to justify that moral outrage. All of that said, one must probe deeply into the reasons into these two fundamental Constitutional provisions for juries in criminal cases, state and federal, for an understanding of the appropriateness of jury recommendations, particularly unanimous ones in favor of leniency, and whether or not the best of the judicial craft can gainsay those recommendations. In the context of our own times, and with an equal understanding of the judicial evolution of the original intent of Article III and Amendment VI, this court, with great respect and reluctance, can not gainsay the

unanimous recommendation of this rural southern Indiana jury for lenience with regard to the imposition of the death penalty. This comes after deep and troubling soul searching based on a profound respect for the principles of federalism (see *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)), but an equally deep and sustained respect for the function of juries in state and federal criminal proceedings where the death penalty can be imposed.

The processes whereby the imposition of the death penalty is imposed in a state criminal case and is thereafter reviewed under 28 U.S.C. § 2254 in a United States District Court involve basic problems of federalism blended from Acts of Congress and Supreme Court decisions dealing with those federal statutes, as well as relevant provisions of the Constitution of the United States. These attempt to demark state court decisions based on state law from those based on federal statute and Constitution. The problem is that so-called state law decisions often reflect and are fed by fundamental federal Constitutional values. Sometimes, the state courts act in accord with the federal law and Constitution. Sometimes such doesn't happen, which leaves open fundamental Constitutional gaps. The action taken in one case by the highest court in a state often leaves difficult remaining concerns for future similar cases. It is the firm opinion of this court that such has occurred as a result of *Schiro v. State,* 451 N.E.2d 1047 (Ind.1983), *cert. denied, Schiro v. Indiana,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983), *Schiro v. State,* 479 N.E.2d 556 (Ind.1985) (PCR denied), *cert. denied Schiro v. Indiana,* 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986), *Schiro v. State,* 533 N.E.2d 1201 (Ind.1989) (PCR denied), *cert. denied Schiro v. Indiana,* 493 U.S. 910, 110 S.Ct. 268, 107 L.Ed.2d 218 (1989), *Schiro v. Clark,* 754 F.Supp. 646 (N.D.Ind.1990)(habeas denied), *aff'd* 963 F.2d 962 (7th Cir.1992), *aff'd sub nom. Schiro v. Farley,* 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994), but *Schiro v. State,* 669 N.E.2d 1357 (Ind.1996) (PCR granted).

It is of no small moment that in the brief filed by the Indiana Attorney General on this subject, no mention of *Schiro* was made. In spite of the fact that the Attorney General of Indiana has chosen to ignore the implications of *Schiro,* the State of Indiana is bound by it under the Equal Protection Clause and can't wiggle out of it by a logic-chopping state law analysis. Clearly, any reasoned application of *Schiro,* excuses the execution of this petitioner no less than Thomas Schiro. To ignore this disparity of treating sames similarly is to lay aside fundamental federal rights imbedded in the Equal Protection Clause of the Fourteenth Amendment. The State of Indiana is clearly bound by the plain meaning of that provision and the treatment of this petition vis-à-vis Thomas Schiro clearly violates the same. The blunt and plain fact is that Schiro was excused from execution by the same state under the same circumstances that it now insists this petitioner be executed. That is most definitely not treating sames the same.

With all deference and in accord with basic federalism, the final decision in *Schiro* leaves open serious *federal* Constitutional questions of equal protection when an attempt is made to justify the imposition of the death penalty in other similar cases. These federal Constitutional concerns cannot now be gainsaid. To put it bluntly, it is most difficult to explain to this petitioner why he will be executed and Thomas Schiro, whose conduct was even more repulsive, could be out of prison even before this petitioner is executed. Sadly this court is here restrained from engaging in this species of argument, but cannot avoid expressing its deepest concern that

the doctrinal efforts of the Supreme Court of Indiana are having the effect of applying the death penalty in a fundamentally unfair manner. But alas, this court does not, and cannot, act as a court of direct review for the decisions of the Supreme Court of Indiana. Nonetheless, the concerns remain.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Justice Stewart, for the majority, implies, at least in the context of that case, that a jury under Amendment VI of the Constitution of the United States, will play a vital role in assessing the penalty for death, but did not address the situation where a jury recommends *against* the death penalty. That was left for another day.

That day came in the opinion of Justice Blackmun in *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), which upheld a statutory system similar to Indiana's, where a state judge can impose the death penalty in the face of a contrary recommendation by the jury. Justice Stevens, for himself and Justices Brennan and Marshall, wrote a strong dissent which stated:

> History, tradition, and the basic structure and purpose of the jury system persuade me that jury sentencing is essential if the administration of capital punishment is to be governed by the community's evolving standards of decency. The constitutional legitimacy of capital punishment depends upon the extent to which the process is able to produce results which reflect the community's moral sensibilities. Judges simply cannot acceptably mirror those sensibilities—the very notion of a right to jury trial is premised on that realization. Judicial sentencing in capital cases cannot provide the type of community participation in the process upon which its legitimacy depends.

If the State wishes to execute a citizen, it must persuade a jury of his peers that death is an appropriate punishment for his offense.

*Spaziano v. Florida*, 468 U.S. 447, 490, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)(Stevens, J., dissenting).

If this court could write on a clean slate, it would fully adopt the Constitutional approach of Justice Stevens, but as a preliminary matter, such is not possible here. However, the way in which the Supreme Court of Indiana has dealt with death penalty cases where a judge imposes that penalty in the face of a contrary jury recommendation raises serious equal protections issues under Amendment XIV of the Constitution of the United States.

The law even in this troubled area need not be perfect, but the equal protection clause represents powerful constitutional values. *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) and *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Here, this petitioner will be executed under precisely the same circumstances that Mr. Schiro was not. This distinction cannot be swept away as a state law matter under *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). This court wants to give the state great federalistic leeway. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746 (1971). However the Equal Protection Clause is fundamental and the State of Indiana has constitutionally flawed conflicting rules where a jury has recommended against the death penalty and the judge goes ahead and imposes it. The Equal Protection Clause is thus violated. This is a fundamental but narrow ruling that in no way will infringe the legitimate application of the death penalty in Indiana. The state simply must follow the Equal Protection Clause.

As a general proposition in federal courts and most state courts, juries trying criminal cases are not advised of the penalties at the outset of the trial. The exception to that is in state and federal proceedings where the death penalty is to be imposed. Under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), it is mandatory that jurors be advised of the possibility of the death penalty being imposed at the very outset of jury selection. Thus, the major premise must be that the jurors are to play a critical role not only in the determination of guilt, but perhaps even in the determination of whether the death penalty is to be imposed. This concept is an important predicate when one is dealing with a case in which such a jury has unanimously advised against the imposition of the death penalty. "Equal protection is the guarantee that similar people will be dealt with in a similar manner, and that people of different circumstances will not be treated as if they were the same." J. Nowak, R. Rotunda & J. Young, CONSTITUTIONAL LAW 587 (1983), *citing* Tussman & ten Broek, *The Equal Protection of the Laws,* 37 CALIF.L.REV. 341 (1949), *cited with approval in United States v. Horton,* 601 F.2d 319 (7th Cir.1979), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979).

This court has strong parallel concerns with those expressed by Justice Sullivan of the Supreme Court of Indiana, dissenting in its most recent case involving this petitioner. *Minnick v. State,* 698 N.E.2d 745, 761–64 (Sullivan, J. dissenting). Although explicitly Justice Sullivan's concerns are generally wrapped up in state law issues, the values he is arguing for also may be the basis of equal protection claims under the Fourteenth Amendment. The main line of Justice Sullivan's argument can, and in the opinion of this court does, support an equal protection flaw in this record.

To paraphrase a statement of Justice Frankfurter, great and important constitutional rights often result from the actions of people who are not very nice. And it is sometimes the painful necessity of the federal judiciary to protect fundamental rights in cases involving very bad people. This is such a case turning on an issue that deserves the careful and in-depth reconsideration of fundamental important provisions in the Constitution of the United States. Perhaps individually this petitioner does not deserve this consideration, but a jury of his peers selected in a rural southern Indiana state court thought that he should be punished but remain alive. And that decision in the view of this court should be constitutionally gainsaid. Except for this serious constitutional deficiency, this record otherwise fully supports a denial of relief under 28 U.S.C. § 2254. For this reason, and this reason only, this petition is granted upon the condition that this petitioner be resentenced for imprisonment during his natural life without parole.

## VI. Conclusion

For the reasons stated above, the petition for writ of habeas corpus is now **GRANTED** conditioned on the State of Indiana resentencing petitioner to life without parole.

**IT IS SO ORDERED.**