Obadyah BEN–YISRAYL, f/k/a
Christopher Peterson,
Petitioner,

v.

Cecil DAVIS, Superintendent, Indiana
State Prison, Respondent.

No. 3:01 CV 65 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 27, 2002.

Prentice H. Marshall Jr., John H. Gallo, Denise Keliuotis, Kelly Cox, Chicago, IL, for Plaintiff/Petitioner.

Thomas D. Perkins, Gary Damon Secrest, Indianapolis, IN, for Defendant/Respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, Judge.

Petitioner, Obadyah Ben–Yisrayl, f/k/a Christopher Peterson[1], was convicted of murder in a state court trial conducted in Lake County, Indiana, and was sentenced to death by the judge conducting that trial. The within petition was filed by counsel in this Court on January 23, 2001 and oral argument was heard in South Bend, Indiana on December 5, 2002. This Court greatly appreciates the high degree of pro-

---

1. Although this court recognizes petitioner's legal name to be Obadyah Ben–Yisrayl, to avoid confusion with the opinions of the Indiana Supreme Court, this court will refer to petitioner by his prior name, Christopher Peterson.

fessional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Peterson v. State,* 674 N.E.2d 528 (Ind.1996), *cert. denied,* 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998) and *Ben–Yisrayl v. State,* 729 N.E.2d 102 (Ind.2000), *cert. denied,* 534 U.S. 830, 122 S.Ct. 73, 151 L.Ed.2d 38 (2001). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The Indiana Supreme Court, in its opinion on direct appeal, described the crime committed by Peterson as follows:

> On the afternoon of December 18, 1990, the Balovski brothers were each found dead inside the Eli Tailor Shop from shotgun wounds to the head. A sawed-off shotgun later recovered from the defendant's apartment was found to have fired a spent casing recovered from the crime scene. The defendant gave a statement to police admitting the shooting of the Balovski brothers, and he made incriminating admissions to an acquaintance.

*Peterson v. State,* 674 N.E.2d 528, 532 (Ind.1996). During the late fall of 1990, several shotgun murders had occurred in Lake and Porter Counties, Indiana. Witnesses, including one sitting with a victim when the attack occurred, reported the "shotgun killer" to be a white man. However, in January 1991, Antoine McGee, a light-skinned black man, was questioned by police in connection with a shooting during an armed robbery at the Gainer Bank branch at the Southlake Mall in Merrillville, Indiana. McGee was accused of being the shotgun killer. McGee denied the accusation, but asserted that Peterson was the shotgun killer. McGee took police to Peterson's mother's home. She gave police permission to enter the home, where they found a shotgun, later determined to be that of the shotgun killer, in a closet in Peterson's bedroom, a room to which McGee also had regular access. Police apprehended Peterson at approximately 4:00 a.m. on January 30, 1991. Peterson was questioned by police until mid-afternoon, at which time he asked to speak with his mother. After a brief conversation, Peterson then asked if he could "sleep on it." The next morning, Peterson was again interviewed by the police, at which time he confessed to committing all seven of the shotgun murders. Peterson was not presented before Lake County Magistrate Judge T. Edward Page until late in the afternoon of January 31, 1991, and Page made a record that he had been waiting all afternoon for Peterson to appear while police continued to interview him.

Peterson was tried twice in Lake County for three of the murders and was acquitted in those two trials, despite his confession. He was then tried in Porter County and convicted of the two murders there, and was sentenced to death. *See Ben–Yisrayl v. State,* 690 N.E.2d 1141 (Ind.1997), post-conviction relief denied 753 N.E.2d 649 (Ind.2001). Lake County then prosecuted Peterson in the present case.

## II. Standard of Review

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United

States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebut-

ting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy,* 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams v. Taylor* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute

have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as de-

fined by Justice Scalia in *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke,* 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

> A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits. ... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.,* citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

In two recent opinions, the Supreme Court of the United States has written clearly on this species of review with *all* justices on the same page! In *Woodford v. Visciotti,* —— U.S. ——, 123 S.Ct. 357, 360–61, 154 L.Ed.2d 279 (2002) that Court stated:

> Despite all these citations of, and quotations from, Strickland, the Ninth Circuit concluded that the California Supreme Court had held respondent to a standard of proof higher than what that case prescribes for one reason: in three places (there was in fact a fourth) the opinion differ "reasonably." 288 F.3d at 1108–1109, and n. 11. This was error. The California Supreme Court's opinion painstakingly describes the *Strickland* standard. Its occasional shorthand reference to that standard by use of the term "probable" without the modifier may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision. *See Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1241, 152 L.Ed.2d 291 (2002) ("probable effect upon the outcome"); *Williams v. Taylor,* 529 U.S. 362, 393, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("probably affected the outcome").

The Court of Appeals made no effort to reconcile the state court's use of the term "probable" with its use, elsewhere, of *Strickland's* term "reasonably probable," nor did it eve n acknowledge, much less discuss, the California Supreme Court's proper framing of the question as whether the evidence "undermines confidence" in the outcome of the sen-

tencing proceeding. This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law. See, *e.g., Parker v. Dugger,* 498 U.S. 308, 314–316, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds, Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *LaVallee v. Delle Rose,* 410 U.S. 690, 695, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973) (per curiam). It is also incompatible with § 2254(d)'s "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), which demands that state court decisions be given the benefit of the doubt.

The California Supreme Court then focused on counsel's failure to introduce mitigating evidence about respondent's background, including expert testimony that could have been presented about his "growing up in a dysfunctional family in which he suffered continual psychological abuse." *Id.* at 355, 58 Cal. Rptr.2d, at 818, 926 P.2d, at 996–998. The California Supreme Court concluded that despite the failure to present evidence of respondent's "troubled family background," *id.,* at 355, 58 Cal. Rptr.2d at 818, 926 P.2d, at 1005, which included his being "berated," being "markedly lacking in self-esteem and depressed," having been "born with club feet," having "feelings of inadequacy, incompetence, inferiority," and the like, moving "20 times" while he was growing up, and possibly suffering a "seizure disorder," *id.,* at 341–343, 58 Cal.Rptr.2d, at 809–811, 926 P.2d, at 996–998, the aggravating factors were overwhelming. In the state court's judgment, the circumstances of the crime (a cold-blooded execution-style killing of one victim and

attempted execution-style killing of another, both during the course of a pre-planned armed robbery) coupled with the aggravating evidence of prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby) was devastating. See *id.*, at 355, 58 Cal.Rptr.2d at 818, 926 P.2d at 1005; see also *People v. Visciotti,* 2 Cal.4th at 33–34, 5 Cal.Rptr.2d 495, 825 P.2d, at 402. The California Supreme Court found these aggravating factors to be so severe that it concluded respondent suffered no prejudice from trial counsel's (assumed) inadequacy. *In re Visciotti, supra,* at 355, 58 Cal.Rptr.2d, at 818, 926 P.2d, at 1005.

The Court of Appeals disagreed with this assessment, suggesting that the fact that the jury deliberated for a full day and requested additional guidance on the meaning of "moral justification" and "extreme duress," meant that the "aggravating factors were not overwhelming." 288 F.3d, at 1118. Perhaps so. However, under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell,* 535 U.S. at ——, 122 S.Ct., at 1852. The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable. It is not that here. Whether or not we would reach the same conclusion as the California Supreme Court, "we think at the very least that the state court's contrary assessment was not 'unreasonable.'" *Id.,* at ——, 122 S.Ct., at 1853–1854. Habeas relief is therefore not permissible under § 2254(d).

*See also Early v. Packer,* —— U.S. ——, 123 S.Ct. 362, 154 L.Ed.2d 263 (Nov. 4, 2002). These most recent cases from the Supreme Court of the United States are a clear and firm judicial signal that under AEDPA collateral review in a United States district court means what it says and that "inferior courts" referred in Article III of the Constitution of the United States should follow the clear Congressional mandates implicit in 28 U.S.C. § 2254(d)(1) and should not take extra liberties with the statutory language chosen by Congress. Those who want to follow these congressional and Supreme Court mandates should take the trouble to carefully read the opinions made (and reversed) in *Visciotti v. Woodford,* 288 F.3d 1097 (9th Cir.2002). It is not for this Court to gainsay these statutory requirements and therefore must take them very seriously.

It is to be noted that under a rule of the Supreme Court of Indiana, specialized training and skills are required for counsel defending persons charged with capital crimes in Indiana. The comments of the Chief Justice of Indiana at 729 N.E.2d 106 regarding the operations of Indiana Criminal Rule 24 are very revealing:

Of course, a capital defendant in this state also receives the protection of Indiana Criminal Rule 24. We are now in the tenth year of the operation of Rule 24. It creates minimum standards for the criminal litigation experience, specialized training, compensation, and caseload of lawyers appointed in capital cases. Both prosecutors and defense counsel agree that "Rule 24 ha[s] led to improved representation by defense lawyers in capital cases." Norman Lefstein, *Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation,* 29 Ind. L.Rev. 495, 509 (1996). "[A] death penalty verdict returned [since the advent of Rule 24 is] more

likely to be sustained on appeal, and the appellate court [is] less apt to find that defense counsel was ineffective." *Id.* at 509. Ben–Yisrayl's counsel were appointed under the requirements of this rule. *Compare,* Ind. Criminal Rule 24 (effective Jan. 1, 1990) *with* (T.R. at 3, 12) (counsel appointed Mar. 4, 1991). Moreover, for more than a half century, Indiana has offered state-financed legal assistance to prisoners seeking post-conviction relief. Ind.Code Ann. § 33–1–7–1 (West 1996) (office of Public Defender created 1945). Funded at 5.6 million dollars in the current year, this state office employs a substantial contingent of lawyers specializing in capital collateral litigation. These lawyers have funds at their disposal for mitigation specialists, DNA tests, mental health professionals, and the like. It is these lawyers who have brought the present petition for Ben–Yisrayl.

*Ben–Yisrayl,* 729 N.E.2d at 106. It is also useful to look at a smattering of decisions in this circuit that represents a judicial play on the requirements under 28 U.S.C. § 2254(d). In *Whitehead v. Cowan,* 263 F.3d 708, 716 (7th Cir.2001), the Court of Appeals stated:

> As the habeas petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, the standard of review contained therein governs Whitehead's claims. *See Lindh v. Murphy,* 521 U.S. 320, 322–23, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The relevant portion of the AEDPA provides:
>
> > An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court

> proceedings unless the adjudication of the claim—. . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . .
>
> As the Supreme Court has explained, a state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonable extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.
>
> On appeal from a ruling on a petition for habeas relief, we review the district court's findings of fact for clear error and its rulings on issues of law de novo. *See Denny v. Gudmanson,* 252 F.3d 896, 900 (7th Cir.2001). If the case falls under the "contrary to" clause of § 2254(d)(1), then we review the state court decision de novo to decide what is clearly established law as determined by the Supreme Court and whether the state court decision was "contrary to"

that Supreme Court precedent. *See id.* If, on the other hand, the case falls under the "unreasonable application" clause, then we defer to a reasonable state court decision. *See id.* Moreover, state court factual findings that are reasonably based on the record are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Gudmanson,* 252 F.3d at 900.

Another panel of the Court of the Appeals in *Todd v. Schomig,* 283 F.3d 842, 846 (7th Cir.2002), stated:

## I. BACKGROUND

On June 1, 1998, Todd filed a petition for a writ of habeas corpus, challenging the constitutionality of his custody in the Pontiac Correctional Center, where he is on death row for his state court conviction of first-degree murder. Our review of his challenge to his conviction and death sentence is controlled by the restrictive standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254; *see also Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (applying the statute to petitions filed after April 24, 1996). Pursuant to the AEDPA, state court factual findings that are reasonably based on the record are presumed correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Cossel v. Miller,* 229 F.3d 649–651 (7th Cir.2000). The following summary of the facts is derived from the state court opinions, and is supplemented where appropriate from the appellate record. *See Whitehead v. Cowan,* 263 F.3d 708 (7th Cir.2001).

## III.

In the first opinion of the Supreme Court of Indiana authored by Justice Dickson, there are three sentences that are very important:

"On the afternoon of December 18, 1990, the Balovski brothers were each found dead in the Eli Tailor Shop from gunshot wounds to the head. A sawed-off shotgun later recovered from the defendant's apartment was found to have fired a spent casing recovered at the crime scene. The Defendant gave a statement to police admitting the shooting of the Balovski brothers, and he made incriminating admissions to an acquaintance.

This petitioner was then charged with two counts of murder, one for each of the Balovski brothers, and the prosecuting attorney of Lake County, Indiana requested the death penalty.

The precise findings of the Supreme Court of Indiana on the confession are worthy of close attention here:

The defendant contends that his confession should not have been admitted into evidence because it was the product of both an illegal arrest and an unreasonable delay in taking him before a magistrate. The defendant confessed to four shotgun murders, including the charged murders, approximately twenty-nine hours after his warrantless arrest by police.

The defendant's arrests resulted from the police investigation of a late night armed robbery and shooting at the Gainer Bank branch at Southlake Mall in Lake County approximately six weeks after the murders of the Balovski brothers. The robbery victim identified his assailant as a black male wearing dark clothing and told police his assailant drove a silver Nissan Sentra automobile stolen from the victim. Soon thereafter the police saw a vehicle matching this description and, observing the license

plate number, confirmed that it was the stolen automobile. The police also observed a copper Grand Am automobile with two occupants, both black males, traveling with the Nissan Sentra and notified dispatch as to this fact. The driver of the Nissan Sentra stopped the car in the middle of the road, exited the vehicle, and fled on foot. The driver, wearing a black jogging suit with purple markings, matched the victim's description of his assailant. Shortly thereafter, another police officer observed two black males on foot in the vicinity, Antoine McGee and Major Moore, one of whom (McGee) fit the description of the assailant who had just fled from police. The two men were transported to the police station for questioning as suspects in the robbery and shooting. McGee identified himself as the driver of the copper Grand Am and told police that defendant had announced his plan to commit the robbery and asked McGee to help. McGee admitted that he drove the defendant to Southlake Mall, waited there briefly and observed the defendant, wearing a black jogging suit and carrying a handgun, get out of the car and approach the bank. McGee then drove away but looked back and saw a silver Nissan automobile arrive at the bank. Later in the evening he saw the defendant driving the same silver Nissan. Based on this information, the police arrested the defendant without a warrant.

The jury found this petitioner guilty of this double murder, but recommended against the death penalty. Judge Clement, giving extensive consideration to the entirety of the record, proceeded to impose the death penalty as to this petitioner. This case has now, as indicated above, been before the Supreme Court of Indiana once on direct appeal and once on denial of post-conviction relief. This Court held

oral argument with very able counsel representing this petitioner in South Bend, Indiana on December 5, 2002, and greatly appreciates the assistance of the lawyers and law firm involved in this important matter.

Although it was not specifically argued there, this Court is of the view that an evidentiary hearing is not in order here under 28 U.S.C. § 2254(e)(2), and under the teaching of *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The main argument made at that proceeding was that trial counsel were ineffective under the Sixth Amendment of the Constitution of the United States and under *Strickland* for failing to introduce the testimony of Patrick Fleming and for failing to object to an instruction on the burden of proof.

It is also suggested that the timing of bringing this petitioner before a magistrate for a probable cause determination following *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), plays into the false confession issue. For authority in this Court and Circuit on *Gerstein, See, Dommer v. Hatcher,* 427 F.Supp. 1040 (N.D.Ind.1975) *rev'd* 638 F.2d 1031 (7th Cir.1980), *previous opinion withdrawn* 653 F.2d 289 (7th Cir.1981). For the so called "48 hour" rule, *See, County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Neither *Gerstein* or *Riverside* invalidate this confession. The 36 hour delay is not a per se violation of the constitutional demands of *Gerstein* or *Riverside.* Additionally, this issue is brought under the 4th Amendment of the Constitution of the United States. Therefore, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) applied. Under *Stone* there has been a full and fair hearing.

## IV.

The false confession issue was dealt with directly in two state trial court proceedings and two state supreme Court opinions. In the state trial court post conviction hearing, a Dr. Richard Ofshe spoke to the court by way of affidavit. The concluding comment by the Indiana Supreme Court:

Ben–Yisrayl also says that his counsel were ineffective for failing to call an expert witness to testify about the existence of and reasons behind "false confessions." [FN6] (Appellant's Br. at 26.) Ben–Yisrayl does not contest the admissibility of his confession. This issue was already raised and resolved on direct appeal. (Appellant's Br. at 27.)

At the post-conviction hearing, Ben–Yisrayl presented an affidavit from Dr. Richard Ofshe, an expert in sociology and psychology who has testified in other courts regarding the "mechanisms of control and influence" in police interrogations. (P–C.R. at 3127–28.) Having reviewed Ben–Yisrayl's case, Ofshe said that he believed Ben–Yisrayl's confession was indicative of a false confession. (P–C.R. at 3133.) This belief was based on Ofshe's opinion that certain facts given in Ben–Yisrayl's statement were inconsistent with facts presented at trial. (P–C.R. at 3132.)

After examining Ofshe's statement, we cannot conclude that expert testimony regarding false confessions would have led to a conclusion opposite that reached by the trial court. At trial, Detective Reynolds, who conducted Ben–Yisrayl's interrogation, was vigorously cross-examined about inconsistencies between Ben–Yisrayl's statement and the facts presented at trial. For example, Ben–Yisrayl said in his statement that he parked his car in front of the tailor shop. This fact, however, was not corroborated by any other witnesses. (T.R. at 2971–72.) Reynolds was also questioned about a discrepancy between Ben–Yisrayl's statement and other witness statements regarding whether money had been stolen from the Balovskis. (See T.R. at 2994–95.) Lastly, Reynolds was extensively cross-examined regarding the amount of detail, or lack thereof, in Ben–Yisrayl's statement. (T.R. at 2976–87.)

Ben–Yisrayl has made no showing that expert testimony regarding false confessions would have led to an acquittal. No ineffectiveness has been shown here. *See Drake v. State*, 563 N.E.2d 1286, 1290 (Ind.1990).

This slice of evidence is too slender a reed upon which to conclude that petitioner's trial counsel was ineffective in this regard. No doubt if Dr. Ofshe had been called before the jury he would have been subject to extensive cross-examination. It is far too speculative to determine that this belatedly proffered evidence would have changed the decision on voluntary confession in the state courts. It is also less than clear that Dr. Ofshe's testimony was available to trial counsel, and if so, would have actually been used. The full affidavit of Dr. Ofshe is attached as an appendix.

This Court has also taken the trouble to read the telephonic deposition of Richard J. Ofshe taken July 9, 1998 in Berkeley, California. PCR pps. 3158–3237. As one with long experience in courtrooms, it is very problematical as to how this witness would have been adjudged by a trier fact. It is all too apparent that the state trial judge who was presented with the Ofshe deposition was less than impressed.

It is of no small moment here that the Supreme Court of Indiana, speaking through its Chief Justice, made a precise finding that this petitioner confessed to these crimes that parallels an earlier state-

ment of fact by Justice Dickson for the Supreme Court of Indiana that "the defendant gave a statement to police admitting the shooting of the Balovski brothers, and, made incriminating moment here that the Supreme Court of Indiana, acquaintance." So the confession is reflected in not one statement in one case by the Supreme Court of Indiana, but statements made in two different opinions by two different justices. Frankly, with all due respect, it takes more than an after-the-fact lawyer statement that such was a false confession. Also of great moment is the summary by the Supreme Court of Indiana of the array of damning evidence against this petitioner.

## V.

█ The state trial court gave Instruction 6 which stated, in part:

A reasonable doubt is a fair, actual, and logical doubt that arises in your mind after an impartial consideration of all the evidence and circumstances in the case.

It also needs to be understood and remembered that violations of state law generally are not cognizable in a proceeding under 28 U.S.C. § 2254. *See Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). On this subject, Chief Justice Shepard stated:

The challenged instruction is indistinguishable from those regularly given by trial courts and approved by appellate courts in Indiana. *Id.* at 425–26. We have held that the instruction sets out "the proper manner in which a juror is to consider reasonable doubt[, because a] doubt cannot arise from some fact or circumstance *outside* the evidence or something in the juror's mind that is not based upon an impartial consideration of all the evidence and circumstances." *Id.* at 426; *see also Conner v. State,* 711

N.E.2d 1238, 1246–47 (Ind.1999) (holding that "arises" reasonable doubt instruction, when read with other instructions, does not erroneously inform jury regarding presumption of innocence), *pet. for cert. filed,* April 7, 2000; *but cf. Winegeart,* 665 N.E.2d at 901–03 (criticizing other aspects of a similar reasonable doubt instruction).

The instruction is proper. Ben–Yisrayl's counsel were not deficient.

Certainly the claim with regard to the instruction clearly falls within the ambit of *Estelle* and is not at odds with United States Supreme Court authority.

## VI.

█ The Supreme Court of Indiana, speaking through its Chief Justice, made a precise finding that this petitioner confessed to these crimes that parallels an earlier statement of fact by Justice Dickson. So the confession is reflected in not one statement, in one case by the Supreme Court of Indiana, but statements made in two different opinions by two different justices. Frankly, with all due respect, it takes more than after-the-fact lawyer statement that such was a false confession.

The petitioner claims that Fleming saw a light-complected or a white man in the vicinity of the tailor shop where the murders occurred before the murders. Chief Justice Shepard, speaking for the Supreme Court of Indiana at 729 N.E.2d, page 108, stated the following with reference to this subject.

In Flemings affidavit, he says that at 4:10 or 4:20 p.m. on the afternoon of the murders, he went to Eli Balovski's tailor shop to drop off some clothes. As he was leaving, he made a U-turn and drove past a car sitting across the street from the tailor shop. He noticed a man sitting in the car, and described the man as "white" with dark, short hair and

"dark eyes." (P–C.R. at 2004.) As he was driving past, he saw the man reach between his legs to make "sure [Fleming] couldn't see what he had there." (*Id.*) Fleming thought the man had a gun. (*Id.*) Fleming also thought the man resembled a police composite sketch of the Balovski murder suspect, which had been published in area newspapers. (*Id.*)

Assuming for the sake of argument that effective lawyering would mean calling Fleming, this Court will not declare counsel ineffective for failure to call a particular witness absent a clear showing of prejudice. *Grigsby v. State*, 503 N.E.2d 394 (Ind.1987). The bulk of Ben–Yisrayl's claim of prejudice rests on the fact that he was acquitted in two trials where evidence of a "light-skinned man" was presented, but convicted in a trial where this evidence was not. We decline, however, to attach this much significance to the acquittals.

The evidence presented at the first two trials regarding another possible shooter was much more compelling than that presented in Fleming's affidavit. In one case, an eyewitness testified that she was sitting in the victim's car when the victim was shot, and observed the shooter standing next to the car window. She described the shooter as a "light complected male wearing a trench coat." (P–C.R. at 2360.)

In another case, two witnesses testified that they were driving down the street when they observed a "white male with long hair and a trench coat" walking toward a car parked near an ATM. (P–C.R. at 2361.) They also testified that the man was carrying a "cylindrical object parallel to his leg." (*Id.*) After passing the man, they drove another one hundred feet, then heard "the blast of two shotgun shells." (*Id.*)

These witnesses thus were able to link the "light-skinned" man to the shootings (indeed, in one case, a witness identified a man fitting this description as the shooter). By contrast, Fleming's observations do not place anyone at the crime scene at the time of the shooting. Rather, Fleming places someone across the street a half hour before the shootings. Although Fleming claims that he thought the man had a gun in his lap, he did not actually see a gun.

There was substantial evidence against Ben–Yisrayl. Antwion McGee, a friend of Ben–Yisrayl's, testified that when he learned that "the shotgun killer" had killed the Balovskis, he called Ben–Yisrayl about the murders. (T.R. at 3366, 3368.) At that time, Ben–Yisrayl told McGee "[t]hat he had got 'em." McGee said, "Got who?" and Ben–Yisrayl replied that he had "got 'em and then he would come by to get [McGee]." (T.R. at 3368–69.) McGee later met Ben–Yisrayl and Ben–Yisrayl told him "[t]hat he had got the guys at the tailor shop." (T.R. at 3369.) Ben–Yisrayl then gave McGee a detailed account of the murders. (T.R. at 3369–70.) McGee also saw a shotgun in Ben–Yisrayl's bedroom closet. (T.R. at 3085–87, 3373.)

McGee later told the police that Ben–Yisrayl was the person who had killed the Balovskis. (T.R. at 3376–77.) After receiving this information, the police searched Ben–Yisrayl's closet and found the shotgun. (*See* T.R. at 3273.) Test results indicated that the shotgun found in Ben–Yisrayl's closet fired a spent shell casing recovered at the site of the Balovski killings. (T.R. at 3119–20.)

After being taken into custody, Ben–Yisrayl confessed to shooting the Balovskis. (T.R. at 2911.) He gave a detailed account of the shootings, indicating that he had entered the tailor shop,

had gone downstairs and shot someone, and had then gone upstairs to shoot another person. (T.R. at 4632.)

Based on the foregoing, it is difficult to imagine that Ben–Yisrayl would have been acquitted but for counsel's failing to call Fleming as a witness. Ben–Yisrayl's claim about Fleming's testimony certainly does not unerringly or unmistakably lead to a conclusion contrary to that reached by the postconviction court. *See Weatherford*, 619 N.E.2d at 917.

Chief Justice Shepard was of the belief that this failure by trial counsel, while it may have violated one part of the *Strickland* test, did not violate the prejudice part, and, therefore, the actions of the trial counsel did not fall afoul of the totality of teaching embedded in *Strickland*. It is useful here to restate precisely and completely all that Chief Justice Shepard said in this regard as noted above. Also of great moment is the summary by the Supreme Court of Indiana of the array of damning evidence against this petitioner.

In *Peterson v. State*, 674 N.E.2d 528, beginning at 535, Justice Dickson goes to great lengths with regard to the confession. Likewise in the opinion of the Supreme Court in 2000, Chief Justice Shepard discusses petitioner's confession and statements at length beginning on page 107 through 109 of the Supreme Court's opinion.

Procedural default will not be applied to claims under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *see Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). However, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) does clearly foreclose all *Brady* claims now claimed by this petitioner. *See also, U.S. v. Morris*, 80 F.3d 1151 (7th Cir.1996).

## VII.

Candor requires this Court to say here and now as it did in the oral argument on December 5, 2002, that it adheres to the constitutional concerns reflected in *Minnick v. Anderson*, 151 F.Supp.2d 1015 (N.D.Ind.2000). Obviously, some of those concerns have now been addressed by statute enacted in the State of Indiana after the convictions in this case. Obviously some of those concerns may, in the *Minnick* or in other cases be addressed appropriately by the Court of Appeals. Also, some of those concerns may be addressed as a part of the judicial aftermath of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). For this Court to here and now bottom a decision on the constitutional concerns expressed two years ago in *Minnick* might be interpreted as an unwarranted act of unnecessary judicial activism in the third tier down of the federal judiciary. While adhering strongly to the constitutional concerns expressed in the *Minnick* opinion at 151 F.Supp.2d 1015, this Court will not here and now bottom a decision on it. These expressed concerns are somewhat similar to those of Judge Ripple's dissent in *Fleenor v. Anderson*, 171 F.3d 1096, 1102 (7th Cir. 1999). This Court has placed in an appendix, the entire current version of the relevant Indiana sentencing statute, I.C. 35–50–2–9. The possible retroactive application of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 has been specifically rejected in *Trueblood v. Davis*, 301 F.3d 784, 788 (7th Cir.2002).

The key issue argued for on behalf of this petitioner has to do with the alleged ineffectiveness of trial counsel in failing to call the witness Fleming. This Court cannot and will not gainsay the *factual* findings of the Supreme Court of Indiana in that regard, and neither will this Court bottom a decision on a highly speculative

comparison of the results in other trials in which Fleming was indeed a witness, and will not speculate on how and why the juries in those cases acquitted rather than convicted. This Court will and does focus on the trial in *this* case, including the facts as the Supreme Court of Indiana specifically found that this petitioner had indeed engaged in a valid constitutional confession. A careful examination within the statutory framework provided by Congress to this Court fails to disclose that this petitioner has sustained the necessary burden to disturb the state court decision to impose the death penalty as to this petitioner. Petition **DENIED.**

**IT IS SO ORDERED.**